**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JIM WILDE,

        Plaintiff,

    v.                            Case No. 23 cv 4634

EPS US, LLC,                   Honorable Sunil R. Harjani

        Defendant.

## MEMORANDUM OPINION AND ORDER

On February 1, 2023, Jim Wilde was terminated from his role as a Sales Development Manager at EPS US, LLC. Wilde was 64 years old at the time. According to Wilde, since he was at 151% of his sales quota in 2022, he was terminated because of his age in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621. In response, EPS contends that Wilde was terminated for failing to meet its legitimate expectations of his role beyond simply hitting his sales numbers. Before the Court is EPS's motion for summary judgment on Wilde's age discrimination claim. For the reasons stated below, EPS's motion for summary judgment [62] is granted.

### Background

Wilde was hired by Electronics For Imaging Inc., the predecessor to Defendant EPS, in May 2015. [71-1] ¶ 3. He was later promoted to Account Executive, Named Accounts in 2017. *Id.* ¶ 5. Then in 2019, Wilde was promoted to a Sales Development Manager (SDM), when he was 60 years old. *Id.* ¶ 6.

The process that ultimately led to Wilde's termination began on November 8, 2022, when Wilde was placed on a Performance Improvement Plan (PIP) by his manager Chris Wood. [80-33].

The PIP ran from November 8, 2022, through December 23, 2022. *Id.* The reasons given for placing Wilde on the PIP included concerns about his sales hygiene and managing the pipeline, specifically, his failure to keep Salesforce current for several months, and that he had been replaced on multiple accounts at the customer's request.[1] [80-32]; [80-33]. To resolve these performance issues, the PIP listed four action areas where Wilde needed to improve: (1) utilizing Salesforce to accurately reflect the current pipeline, (2) detailing all opportunities to reflect the current stage of the sale and relevant information (3) being ready to discuss all opportunities at weekly 1:1 meetings or with any member of leadership, and (4) adhering to the sales process. [80-33] at 2. These facts are undisputed.

According to Defendant, Wood notified Wilde that the PIP was being extended on December 21, 2022. [63] at 13; [80-19] at 1. But Wilde claims he was never notified that the PIP was extended. [71] at 5; [84-1] at 150:17-151:2. While the parties dispute whether Wilde was notified about the PIP extension, the record is undisputed that the PIP extension document is dated January 27, 2023. [80-34]. Likewise, it is undisputed that the termination process began on Saturday January 28, 2023, when Wood emailed Mary Aignasse, a human resources employee, stating his intention to terminate Wilde, to which Scott King, the head of sales, replied, "This is a must." [67-6] at 9. Then on Monday January 30, 2023, Wood sent another email to human resources listing his reasons for the termination. *Id.* at 8–9. These reasons included: (1) his inability to update Salesforce, (2) upset customers, (3) lack of process and urgency, (4) poor pipeline build, and (5) that he was sloppy, forgetful, and challenged. *Id.* Wilde was ultimately terminated on February 1, 2023.

---

[1] Salesforce or SDFC is a software used by Defendant to monitor, measure, and record interactions with existing and prospective clients, and to see billing and communications with customers. [71-1] ¶ 12. Sales hygiene and pipeline management are terms of art referring to the documentation and maintenance of information about existing and potential clients within Salesforce.

**Legal Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court does not "weigh the evidence and determine the truth of the matter" but rather determines whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

**Discussion**

Wilde brings a single claim of age discrimination under the ADEA against Defendant, his former employer. Defendant asserts that summary judgment should be granted on this claim because the record shows that Wilde was terminated for deficient performance. [63] at 6.

"Congress enacted the ADEA in 1967 to 'promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quoting *Carson v. Lake County., Ind.*, 865 F.3d 526, 532 (7th Cir. 2017) (alteration in original) (quoting 29 U.S.C. § 621(b)). The ADEA protects workers forty years of age and older by making it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

To prevail under the ADEA, a plaintiff "must show by a preponderance of the evidence that his age was the but-for cause of [defendant's] decision to fire him." *Senske v. Sybase, Inc.*, 588 F.3d 501, 506–07 (7th Cir. 2009). An ADEA plaintiff may establish their claim by either the holistic approach established in *Ortiz*, or the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). Under the *McDonnell Douglas* approach, "the plaintiff first must make out a prima facie case of discrimination by demonstrating that (1) [he] is a member of the protected class (people over forty years of age), '(2) [he] performed [his] job to [his] employer's legitimate expectations; (3) [he] suffered an adverse employment action; and (4) one or more similarly situated individuals outside [his] protected class received better treatment.'" *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 469–70 (7th Cir. 2025) (quoting *Brooks v. Avancez*, 39 F.4th 424, 434 (7th Cir. 2022). "If the plaintiff successfully meets these requirements, the defendant must 'articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020)). "If the defendant successfully shoulders that task, the plaintiff must demonstrate that the defendant's proffered reason is pretextual." *Id.* at 470. "When considering an ADEA claim at summary judgment, a 'court must consider all the evidence in the record to determine whether a reasonable jury could find that the plaintiff suffered an adverse action because of her age.'" *Id.* at 469 (quoting *Vassileva v. City of Chicago*, 118 F.4th 869, 873 (7th Cir. 2024)).

Wilde argues that he has established his claim under both the holistic approach and through the *McDonnell Douglas* burden shifting framework. As such, both methods are discussed below.

## I. Holistic Approach

Wilde contends that there is direct evidence showing Defendant terminated him because of his age. Under the holistic approach established in *Ortiz*, courts "look at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination." *Vichio*, 88 F.4th at 691 (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "Under *Ortiz*, the Court must determine 'whether the evidence would permit a reasonable factfinder to conclude' that the plaintiff's age 'caused the discharge or other adverse employment action.'" *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019) (quoting *Ortiz*, 834 F.3d at 765). According to Wilde, the evidence of prohibited discrimination includes: (1) Wood's comment at a sales meeting in January 2022, (2) a shift in how Wilde was treated after turning 60, and (3) the process by which he was terminated. Defendant contends that Wilde's evidence is either incorrect or taken out of context.

### a. Wood's Comment

Wilde's first piece of evidence to show Defendant's age-based animus is a comment made by Wood a year before Wilde's termination. [71] at 4. Wilde testified that at a January 2022 sales meeting in Las Vegas, he was walking down the hallway with Wood when Wood "made a comment along the lines of my goodness, this industry needs youth, referring to the whole industry because everybody at the meeting was old. And I'm thinking is my job in jeopardy?" [84-1] at 173:6-15.

This situation is like what the Seventh Circuit addressed in *Skiba*, where the plaintiff asserted that he was asked how old he was in the job interview as evidence of age discrimination. 884 F.3d at 720. However, as the interview question came more than two years before the plaintiff's position was eliminated and from a person who promoted plaintiff at the age of fifty-eight, this did not provide any probative value as evidence of unlawful intent. *Id.* Instead, the

5

Seventh Circuit found that "the incident does not, by itself, directly support an inference of discrimination here because it was neither asked around the time of [defendant's] challenged decisions nor made in reference to the relevant adverse employment actions." *Id.* Similarly, Wood's comment was made a year before Wilde was terminated and not made in reference to an adverse employment action, or even made directly about Wilde. The comment was generally about the attendees at the sales conference and the industry as a whole. This, without more, is insufficient to create a genuine dispute about unlawful intent.

### b. Treatment After Turning 60

Next, Wilde asserts that there was a change in how he was treated after turning 60. [71] at 4–5. According to Wilde, after he turned 60 in 2019, Wood's communications about him shifted by publicly praising him while privately casting his performance in a negative light. *Id.* at 5. To support this assertion, Wilde identifies several emails from July 2019.

In the first email, on July 2, 2019, Wood emailed Gaby Matsliach about the resignation of a different employee because of poor performance and included a paragraph about how he had "been discussing Jim Wilde's poor performance in the Named Accts team with him." [80-13] at 1–2. Wood then states, "I like Jim's attitude, grind and approach but he struggles with the complex strategic sell that is the world of Named Accounts. I think he would do better in a regional role where the sales process and cycles are simpler and more transaction based. I am therefore proposing that Jim takes on Sean's Regional SDM role and I will be opening a req. for a new Named Accts SDM. I spoke with Jim and he would like the Regional role." [80-13] at 2. While the email simultaneously remarks on his "struggles" in his current role and proposes moving him to a different position, the email also shows Wood complimenting Wilde's "attitude, grind and approach[,]" and did not suggest that age had anything to do with his performance.

Wilde also argues that King's response to Wood's July 2, 2019, email is evidence of a scheme to discriminate against him. In response to Wood's comments, King writes:

> Thanks for the update.
> I'm supportive of what you think is best and would like to understand a bit more about the change so I'm on same page with your thinking and expectations.
> Can we discuss some details tomorrow? Maybe about 45 minutes?
> I'm available after 1p EST. Please set a time or tell me what's good for you and I will. I'm on line.
> Some questions to talk about (no need to email):
> Is this short-term fix & transition plan to ultimately replace Jim too or a soft landing to try a better fit for Jim?
> What makes us think he can be better in this role? This is strike 2 for him at EFI.
> What are Jim's numbers for the year vs plan?
> What is your assessment of his performance – how much is him as a sales person vs other realities?
> Where is he strong and where is he weak?
> How can we help him to develop and improve? I'd love to take some extra-ordinary measures to help him develop beyond just another shot if we believe we know where to help him.
> Etc...[2]

Wilde maintains that King's remark "(no need to email)" was part of a secretive and undocumented scheme that shows discriminatory motive. [71] at 5. But that is not a reasonable interpretation of the email, as the statement is "innocuous when viewed in context." *Skiba*, 884 F.3d at 720. The July 2019 email was sent at 8:09 p.m. and as King testified "it was late at night so [he did not] need a response right now so let's have a conversation." [84] at 104. King explained that it was "too much to have to write" and that his "desire" was to have a "two-way conversation, not a one-way e-mail." *Id.* at 105. King's testimony on this point is unrebutted. Read in context, King's comment and the subsequent list of questions merely set the talking points for the meeting between King and Wood, which was also being scheduled in this email exchange. While the list contains a question about whether the plan is to ultimately replace Wilde, it also includes a question about how to help him improve and that King would "love to take some extra-ordinary measures

---

[2] [80-11] at 1.

to help him develop" which discredits Wilde's theory that this was a one-sided scheme. [80-11] at 1. Further, none of these comments can be attributed to Wilde's age. While a plaintiff is entitled to the benefit of inferences drawn from evidence at summary judgment, that benefit is limited to "only reasonable inferences, not every conceivable one." *Skiba*, 884 F.3d at 721 (quoting *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014)).

The statement here is similar to those analyzed by the Seventh Circuit in *Skiba. Id.* at 720. In *Skiba*, the plaintiff also identified various remarks made by hiring managers after rejecting his applications as evidence of bias against his age. *Id.* However, the Seventh Circuit found that each of these statements were "innocuous when viewed in context." *Id.* Statements about the plaintiff needing extra training, that an alternative candidate would be "a little faster" than plaintiff, or that plaintiff was "low energy" were not attributed to the plaintiff's age and there was no indication in the evidence that it was. *Id.* at 720–21. Additionally, one of the manager's swore in an affidavit that he did not know the plaintiff's age at the time of the interview, which Plaintiff did not rebut. *Id.* at 721. Thus, even though plaintiff was entitled to the benefits of inferences in his favor at summary judgment, such a benefit does not extend to "inferences that are supported by only speculation or conjecture." *Id.* (quoting *Argyropoulos v. Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (cleaned up). As in *Skiba*, Wilde's proffered theory of a longstanding scheme to terminate him because of his age "is too divorced from the factual record to create a genuine issue of material fact." *Id.*

Wilde then argues that in October 2022, Wood and King were sending "coded" documents about resetting and replacing him. Wilde identifies an October 10, 2022, email thread between Wood and King. [71] at 5. At the end of the email thread, Wood asks King a question about a

conversation they had the prior week: "Having a top team/ Jim Wilde/ resetting some coverage or territories." [80-14] at 1. King responded:

> Ahhh I remember that. Yes, happy to discuss replacing Jim anytime.
> On that note, I'm in [Salesforce] looking for updates on roll over deals before reaching out and the notes I see from Jim are old

Then, King thanks Wood for the updates he made to these notes after Wilde's last comments. *Id.* Wilde does not explain how this exchange is "coded," or how it is evidence of age discrimination. When read in context, while the email indicates a discussion about replacing Wilde on the team, the discussion is primarily about Wilde's notes in Salesforce not being current, which was one of the main reasons Wilde was placed on a PIP and eventually terminated. *See Skiba*, 884 F.3d at 720. This does not support the argument that Wilde was terminated because of his age.

Lastly, Wilde points to his own speculation during his deposition about the possibility that Defendant was "trying to clean house to get younger people in" but he did not provide any evidence to base this speculation on, beyond the single comment made by Wood at a sales meeting in January 2022, discussed above. [84-1] at 172:02-173:15. Therefore, Wilde has not presented any evidence to create a genuine dispute that he was treated differently after turning 60.

### c. Termination Process

Finally, Wilde contends that his termination was a result of a facially deficient process which could allow a jury to infer that the outcome was predetermined. It is undisputed that Wood emailed Wilde, copying King and Mary Aignasse from human resources, listing his complaints about Wilde's performance and informing Wilde he was going to be placed on a PIP:

> Enough is enough. I have asked you on multiple occasions over many months to keep SFDC current. I brought up the delinquent October opps on our team call 10-31, and said they needed updating. I sent an email to you and the team on 11/1 calling you out by name, and still find that today on November 7th you are the only team member with October opps (five opps, totaling over $400k). There are only two key tasks that I ask of SDM's; create and manage a pipeline, and close sales.

Sales hygiene is a condition of being on my team, and I now have no confidence in your ability to manage your pipeline.

I'm going to put you on a PIP in the last attempt to get you to do your job properly, as all other methods have failed. I have already replaced you on multiple accounts at the customer's request, and I now worry about others. I will prepare the paperwork and then we can discuss on our 1:1 tomorrow.

Finally, get your pipeline updated by the end of today.[3]

It is likewise undisputed that the original PIP was from November 8, 2022, ending December 23, 2022. Wilde's PIP stated the following:

Jim, in reference to our conversations and multiple emails including today, I want to reiterate that your overall work performance is trending as, does not meet the expectations of a Sales Development Manager. There are several areas of job performance where we need to see immediate improvement on your behalf.

In an effort to address these performance deficiencies, the following Performance Improvement Plan will be initiated 11/8/2022. It is my intention to help you achieve the objectives outlined below; however, meeting the objectives of this Plan is your responsibility. The period of this plan will be 45 days, beginning on 11/8/2022 and ending on 12/23/2022  However, if at any time, it appears that you are not making adequate progress towards the objectives in the Plan, you will be subject to further disciplinary action, up to and including, immediate termination of your employment with ePS. The Plan period may also be extended, at the discretion of your manager, however, in no event will the Plan period exceed 90 days in total duration, including any such extensions.

**Problem Overview**

Your current performance does not demonstrate the overall quality of work necessary to succeed in your current position. We have discussed on multiple occasions, over many months to keep SFDC current. I brought up the delinquent October opps on our team call 10/31/22, and said they needed updating and then I sent an email to you and the team on 11/1/22 addressing you personally, and still find that yesterday on November 7th you are the only team member with October opps (5 opps, totaling over $400k). There are only two key tasks that I ask of SDM's; create and manage a pipeline and close sales.

As we have discussed many times, sales hygiene is condition of being on my team, and at this point, I need to see clear improvement in your behavior to show me that you can manage your pipeline.

---

[3] [80-32].

Your immediate attention is required to correct these problem areas. Listed below is an action plan for improving your performance that I expect to be followed during this period and on an ongoing basis thereafter.

**Action Plan**

Though not limited to the following list, it is essential that you improve in the following areas:

1) Utilize SalesForce to accurately reflect your current pipeline at all times

2) Details of all opportunities to reflect the current situation to the best of your knowledge: Sales stage, value, forecast close date, probability, MEDDIPCC docs attached for deals over $200k, products being sold, next steps

3) Be ready to discuss all opps at our weekly 1:1 meeting, or with any member of ePS leadership

4) Adhere to the ePS Sales Process, particularly that Discovery is done and documented, and the ROI prepared for all opportunities over $100k

I ask that all of the above 4 points start happening immediately and continue to happen on an ongoing basis.

I firmly believe these objectives are reasonable and achievable. We will hold meetings, weekly, to review your progress. I will also be available if you have any questions. Failure to successfully complete the objectives of the Performance Improvement Plan, or failure to sustain this level of performance after the PIP is successfully completed, will lead to further disciplinary action up to and including your termination from the company, subject to applicable law.[4]

The dispute is not over the creation or the content of the PIP, but rather whether it was properly extended. Wilde insists it was not. [71] at 5. Wilde testified that he was not made aware of the extension and notes the PIP extension document is dated January 27, 2023. [84-1] at 150:17-151:2; [80-34]. However, Defendant contends that Wood informed Wilde about the extension on December 21, 2022, and that the paperwork was simply delayed. To support this Defendant relies on the testimony of King and Wood, and an email thread between Wood, King, and human resources staff in December indicating that Wood decided to extend the PIP and that he spoke to Wilde about the extension on December 21, 2022. [84-3] at 107; [84] at 134; [80-19] at 1. As this

---

[4] [80-33].

is a motion for summary judgment and facts must be viewed in the light most favorable to Wilde and all inferences drawn in his favor, the Court construes the evidence as though Wilde was not notified about the extension of the PIP in December.

Even if Wilde did not know about the extension, that does not mean the process was flawed or that this is evidence of age discrimination. According to Defendant managers can extend PIPs at their discretion and since Wilde was never informed that he was off the PIP it means he was still on the PIP. Wilde's PIP states that "[t]he Plan period may also be extended, at the discretion of your manager[.]" [80-33]. Defendant's guidance for managers on PIP's also states that "[e]xtensions in the duration period should be discussed with the applicable HR manager and provided by you" and Defendants provided unrebutted testimony that Wood and King emailed the HR staff about the extension on December 21, 2022. [80-38] at 2; [80-19]. While failing to notify Wilde may have been against the company's internal processes, the PIP could be extended at the manager's discretion after a discussion with HR, which occurred.

Regardless of whether the PIP was properly extended, Wilde does not show how this supports an inference of age discrimination. Wilde claims that Wood ignored several emails from HR about Wilde's PIP prior to December 21, 2022, but the extension was ultimately addressed with HR prior to the PIP's expiration. [80-19]. Wood testified that December is their busiest month of the year and that is why he did not address the HR email sooner. [84-3] at 96. Wilde fails to rebut that explanation for the delay, but more importantly this fact does not suggest something more sinister was occurring.

Wilde also considers suspect that there was only one day between the date of the PIP extension, January 27, 2023, and Wood's email about deciding to terminate him on January 28, 2023. [67-6] at 9. Absent Wilde's conjectures, he provides no evidence to support his theory that

12

this indicated something was amiss. But both Wood and Melissa Harvan, Vice President of Global Human Resources at EPS, testified that the documentation was just delayed, because the conversation about the extension had already occurred. [84-3] at 107; [84-2] at 126. Further, the deficiencies were the same in the first PIP and the extension and Wilde was expected to perform the action items outlined in the PIP on an ongoing basis, so even if it officially ended, he would still be required to perform those tasks. *See* [80-33]; [80-34]. Based on this evidence, no reasonable jury could conclude that Wilde was terminated because of his age.

## II. Indirect Evidence under *McDonnell Douglas*

Alternatively, Wilde asserts that he met Defendant's legitimate business expectations because he met the sales quota, and that Defendant's reasons for terminating him were pretextual. Defendant responds that Wilde was terminated because of upset customers, Salesforce issues, lack of process and urgency, poor pipeline build, and for being sloppy, forgetful, and challenged. Defendant further argues that Wilde failed to show different treatment between him and younger comparators, and that his allegations of pushing out older employees are baseless.

As Defendant justifies the termination by asserting that Wilde failed to meet its legitimate performance expectations, the question about whether he met Defendant's legitimate expectations merges with the question of whether Defendant's reasons for taking adverse employment action against Wilde were pretextual. *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 914 (7th Cir. 2025). Therefore, the Court will "focus on the question of pretext, bearing in mind that without sufficient evidence of pretext [Wilde] cannot show that he was meeting [Defendant's] legitimate expectations." *Senske*, 588 F.3d at 507 (citing *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006)).

### a. Pretext

"To say that an employer's justification is a pretext means to say that it is 'a lie, specifically a phony reason for some action.'" *Murphy*, 140 F.4th at 914 (quoting *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023)). "To meet his burden, [Wilde] 'must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in the employer's asserted 'reasons that a reasonable person could find it unworthy of credence.'" *Id.* (quoting *Marnocha v. St. Vincent Hosp. & Health Care Center, Inc.*, 986 F.3d 711, 721 (7th Cir. 2021)). However, the Court "is not a 'super personnel department that second-guesses employers' business judgments.'" *Id.* at 915 (quoting *Riley v. Elkhart Community Schools*, 829 F.3d 886, 895 (7th Cir. 2016)). To show that Defendant's explanation is not credible, Wilde "must point to evidence that they are not the real reasons it fired him, have no grounding in fact, or are insufficient to warrant the termination decision." *Senske*, 588 F.3d at 507 (citing *Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008)). The ultimate question, is whether the same events would have transpired had Wilde "been younger than 40 and everything else had been the same." *Id.* (quoting *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994)).

As it is undisputed that Wilde hit 151% of his sales quota in 2022 and was named a top producer as a result, Wilde asserts that his placement on a PIP and termination for performance issues was pretextual because Defendant only cared about the sales numbers of its sales employees. However, evidence of exceeding sales quotas and being a top earner, alone, is insufficient to establish that Defendant's reasons for terminating Wilde were pretextual. In *Senske*, the plaintiff argued that because he was the defendant's "top earner for North America in 2004[,]" no juror could believe he would be terminated in 2005 for performance deficiencies. 588 F.3d at 507. It was undisputed that Senske exceeded his revenue quota for 2004, but this was based entirely on

deals in the fourth quarter that he did not assist in or that he abdicated the task of negotiating the final details. *Id.* at 507–08. Further he failed to meet his quota in the eight preceding quarters. *Id.* at 507. The Seventh Circuit found that the plaintiff failed to identify any evidence that "cast doubt on the sincerity" of the reasons the defendant provided for his termination. *Id.* at 508–09. The defendant's reasons for terminating plaintiff included complaints from clients about their dissatisfaction and plaintiff's failure to act as a team player, which the Seventh Circuit found to be "sufficient, standing alone, to show that [plaintiff's] age was not the but-for cause of his termination[.]" *Id.* at 509. The Seventh Circuit also rejected the plaintiff's arguments that the client complaints were about technical issues that another employee was entirely responsible for, and that the complaints about him not being a team player were insincere, when the evidence showed his failure on both accounts. *Id.*

Wilde's arguments are similar to those in *Senske*. While it is undisputed that Wilde exceeded his sales quota in 2022, that does not render invalid Defendant's complaints about other aspects of his performance. Like in *Senske*, Defendant's termination decision was based on conduct other than Wilde's most recent sales figures. Defendant claims Wilde deficiently performed other functions of his role, particularly the failure to keep Salesforce updated, follow the sale process, and timely respond to customers resulting in multiple customers either asking that he be removed from their accounts or losing the sale. Instead of addressing these deficiencies, Wilde posits that Defendant only considered sales numbers when evaluating performance.

To show that only sales quotas mattered as a performance metric, Wilde identifies comments written by his supervisor in his and other employees 2019 and 2020 annual performance reviews. For example, on Wilde's 2020 annual review, Wood wrote "We are measured on sales and nothing else." [71] at 6; [80-46] at 1. Wood also wrote on James Shipp's 2020 review "hitting

plan is the main measurement," and on Gerald Usry's review that he agreed with Usry that it was "not a good year" when Usry was at 66% of his plan and that it was "disappointing". [71] at 6–7; [80-43] at 2; [80-44] at 1. Defendant argues that Wilde took these comments out of context—that they do not establish that the company only cared about sales numbers, and that this was before the company became EPS and was under different management and control.

On review of the entire record, the Court determines that Wilde has taken these comments out of context. Starting with Wood's comment on Wilde's 2020 performance assessment, Wood wrote that "We are measured on sales and nothing else. It takes skills, but you must escalate and let those responsible be accountable." [80-46] at 1. But this comment was in response to a goal for Wilde to stop getting pulled into other aspects of the business, so Wood was responding to that goal. Wilde's next goal was "2020 goal of using [Salesforce]" to which Wood wrote "I still think this is a blind spot, and I spend too much time asking you for updates and accuracy." [80-46] at 2. This shows that Wood's criticism of Wilde's Salesforce use was a documented long-standing complaint and that meeting sales quotas was not the only item discussed in annual performance reviews.

Likewise, Wood's comments on other employees' reviews about the importance of hitting their sales numbers were in response to goals about those employees hitting their sales numbers. Wood's comment to Shipp was in response to a goal of "Drive client satisfaction and develop deeper relationships in my territory" and his response to Usry was for a goal of "Above everything else, hit your plan in 2020." [80-43] at 2; [80-44] at 1. Thus, in the context of the goals listed, Wood's comments were naturally about the need to meet sales numbers. But it does not establish that the only performance metric Defendant used was sales figures and Wilde does not identify any other evidence to show that employees were only judged based on their sales.

16

Also using these reviews, Wilde claims that because Shipp and Usry both received "Below Expectations" ratings in 2020, but were not terminated despite having below quota sales, this is evidence that his termination in 2023 was pretextual. [71] at 12. That argument, however, ignores the fact that Wilde also missed his sales quota in 2020 and was not terminated. [80-46] at 1. Thus, contrary to Wilde's assertions, this shows that merely having a bad sales year was not the sole reason for termination or being placed on a PIP.

Wilde next argues that since he was congratulated and publicly acknowledged by management for his sales numbers and closing deals, he was meeting performance expectations. [71] at 12. To show this, Wilde identifies several internal emails where his supervisors congratulate him on closing individual deals in 2022. [78] ¶¶ 39–40; [80-2]; [80-25]. But again, this does not establish that Wilde met all of Defendant's legitimate expectations or that its reasons for termination were pretextual. Sending one-off emails congratulating Wilde after a deal closes does not establish overall positive performance. This is unlike the facts in cases like *Murphy*, where the court found there was ample evidence beyond the plaintiff's own self-serving testimony, showing his positive performance. *Murphy*, 140 F.4th at 915–16. In *Murphy*, the plaintiff showed that throughout his entire tenure at Caterpillar he always met or exceeded performance expectations and was publicly commended for successfully leading a high-profile project just before being placed on a performance action plan. *Id.* Wilde put forth no such evidence here.

Another reason given for Wilde's PIP and termination was his failure to maintain and update Salesforce. Wilde argues that this reason was pretextual because other SDMs in 2019 received negative feedback about their Salesforce etiquette, but they were not terminated or placed on a PIP. [71] at 12. Specifically, Wilde points to Shipp's, and Fee's annual reviews where they received identical feedback from Wood about their Salesforce maintenance: "Constant Source of

frustration for me. You wasted many hours of my and other SLT members time because you didn't keep [Salesforce] current. Also indicates a lack of process and makes forecasting impossible." [78] ¶ 10. However, as Wilde also received this feedback in 2019 and was not placed on a PIP or terminated at that time, it does not establish that in 2023, when he was terminated, that Defendant's complaints about his Salesforce hygiene were pretextual.

This is unlike cases where a plaintiff had a perfect record before an abrupt negative shift in their performance reviews. For example, in *Vichio*, prior to his termination by a new supervisor, the prior vice president of operations considered the plaintiff to be an "exemplary worker" and his managers saw him as a top employee. 88 F.4th at 692. This stands in stark contrast to Wood's complaints about Wilde's Salesforce practices dating back to his 2019 annual review. [80-52] at 4–5. Thus, unlike the plaintiff in *Vichio*, Wilde's performance was not "virtually pristine" such that the reasons for his termination could be called into question. 88 F.4th at 692.

Nor was the performance plan here like the plan given to the plaintiff in *Murphy* where a deadline had passed before the plan was presented to him. *Murphy*, 140 F.4th at 917 (finding the plan was written so that the plaintiff was in default before it even began). Wilde's original PIP contained action items that he could complete within the allotted time period and there is no evidence that it was presented to him in bad faith. Regardless of the possible delays surrounding the PIP extension, the first PIP required the improvements continue on an ongoing basis, so it was not a situation where Wilde only had one day to fix the issues before he was terminated. *See* [80-33]; [80-34].

Moreover, Wilde does not dispute that several customers requested that he be removed from their accounts or the complaints from customers about his lack of or slow response to their inquiries. This includes a complaint from a customer in the days prior to his termination that

18

resulted in the loss of a possible sale. Like the plaintiff in *Senske*, instead of disputing the customer complaints, Wilde argues that the complaints, while directed at him, were about other employees or tasks outside of his control or that the customer was the problem. 588 F.3d at 509. Those arguments were unsuccessful in *Senske* and are equally unavailing here. For example, with one customer, Wilde does not dispute that she complained about his lack of response, that he did not respond to her, and that she requested he be removed from his account. [84-1] at 109:8–114:24. Instead, he testified that he "screwed up with [customer representative], and as a result, I lost [account]" but that there was a personality fit issue between him and the customer representative and that she wanted more attention than he provided and that "maybe [he] didn't want that account." *Id.* at 85:7-86:1, 109:8-118:21. He also testified that since this customer was not going to purchase anything again for a while, he did not view it as his job to respond. *Id.* at 116:11-118:21. For another customer, Wilde testified that despite being "a very good customer … from [his] perspective, there was very little or no future sale there for me." *Id.* at 83:6-10. Wilde was not surprised when the customer requested to remove him as they "put that blame on" him and Wood took over the account. *Id.* at 83:2-84:20.

Finally, one of the reasons Defendant's provided for terminating Wilde was his continued inability to follow the sales process. Plaintiff does not dispute that he would skip steps or act outside of the Defendant's sales process, and in fact testified at his deposition that he would do so. *Id.* at 78:23-85:6, 98:5-99:15, 102:19-103:4. Wilde testified that he would skip steps in the sales process if a customer did not want to do it or if he thought it would turn away a customer. *Id.* This is like the issues addressed in *Arnold v. United Airlines, Inc.*, 142 F.4th 460 (7th Cir. 2025).

In *Arnold*, the plaintiff argued that her employer's cited performance deficiencies were pretextual and untrue, but while she complained about her employer's responses to her

19

deficiencies, she offered nothing at summary judgment to suggest that her performance did not display those deficiencies. 142 F.4th at 474.  Thus, the Seventh Circuit found that the company's explanations were unrebutted, and plaintiff had not demonstrated pretext or that she was performing to the company's legitimate expectations. *Id.*  "[T]he ADEA requires not just 'that age was a motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred.'" *Id.* (quoting *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009)).  Like the plaintiff in *Arnold*, Wilde's claims of discrimination "would require significant speculation and assumption of ulterior motive." *Id.*  Wilde has offered nothing to show that he was meeting Defendant's legitimate expectations and conceded the accuracy of several of Defendant's complaints.  Wilde instead insists that Defendant did not actually care about those other actions and only cared about sales, but he fails to provide evidence to support that claim.

"To show pretext, a plaintiff must do more than simply allege that an employer's stated reasons are inaccurate; [he] must still have some circumstances to support an inference that there was an improper motivation proscribed by law." *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024) (internal quotations omitted).  Wilde has not done so here.  Therefore, Wilde fails to show that Defendant's reasons for terminating him were pretextual and that he met Defendant's legitimate expectations.

### b.  Similarly Situated Younger Employees

Even if Wilde could show pretext or that he met Defendant's legitimate expectations for his role, a plaintiff in an age discrimination case has the burden to show that similarly situated younger employees were treated differently.  While the comparator "need not be identical in every conceivable way," similarly situated employees "must be 'directly comparable' to the plaintiff 'in all material respects[.]'" *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting

*Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). "A valid comparison 'normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Arnold*, 142 F.4th at 472 (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404–05 (7th Cir. 2007)). The purpose of the inquiry "is to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Coleman*, 667 F.3d at 846 (quoting *Humphries*, 474 F.3d at 405). "Although similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (cleaned up) (internal quotations omitted). As a result, "[t]here must be 'enough common factors ... to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Coleman*, 667 F.3d at 847 (alteration in original) (quoting *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007)). In the usual case, "a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Wilde makes no such showing here. Wilde fails to identify any employee who was similarly situated to him but received different treatment from Defendant. While Wilde identifies other employees who received some of the same comments in their 2019 annual reviews as him about failing to update Salesforce, this does not establish that they continued this deficient conduct

in 2023 when Wilde was terminated. While Wilde provided a table listing the ages, positions, start dates, and end dates for employees, in *Skiba*, the Seventh Circuit held that a table listing the names, ages, and positions of 37 employees did not amount to enough "amplifying detail of the employees' qualifications or employment history that would allow this Court to comfortably conclude their hiring was the result of discriminatory motive rather than some other explanatory variable." 884 F.3d at 723. Further, Wilde fails to show that the younger employees who were retained had similar complaints filed against them by customers, so none of the comparators were similar enough to him to render any of the distinct treatment suspicious. *See Senske*, 588 F.3d at 510 (finding the plaintiff failed to show that any of the proposed similarly situated employees received the same internal complaints to render suspicious his different treatment).

Without citation to the record, Wilde asserts that younger SDMs who missed expectations were not subject to the same treatment but failed to offer any such examples.[5] [71] at 11. Although Wilde makes blanket statements that older employees were replaced by younger ones, he fails to support this assertion with any evidence. While he provides the ages of some of the employees who no longer work for Defendant and some who were either hired or retained, he does not establish why those employees left or that hired or retained employees engaged in similar conduct. Courts are not "obligated in considering a motion for summary judgment to assume the truth of a nonmovant's conclusory allegations on faith or to scour the record to unearth material factual disputes." *Skiba*, 884 F.3d 722–23 (quoting *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th Cir. 1998)). Thus, this argument fails.

---

[5] Wilde argues that while Wood emailed eleven SDMs to complete self-evaluation forms in January 2021, Defendant only produced five performance reviews and that this obstructed his ability to identify similarly situated comparators. [71] at 11. However, discovery has closed and the time for arguing about the completeness of the productions has passed.

**Conclusion**

For the reasons stated above, Defendant's Motion for Summary Judgment is granted. [62].

**SO ORDERED.**

Dated:  August 25, 2025

_____
Sunil R. Harjani
United States District Judge